Please call the case Ms. Clark. Claim 2879 in Estate of Samuel Zagaria. Good morning. Good morning. May it please the court, my name is William Broderick. Before you is a presumed dead estate case, and I'm representing the presumed decedent and appellant Samuel N. Zagaria, Jr. We are asking this court this morning to overturn an order wherein Mr. Zagaria has been compelled to turn over his own This case, as you notice, is interesting. It's not a simple creditor's case, a creditor's claim against an estate. Because of the unique facts of this case, every angle in this case, you have to dig a little bit deeper in this one. I'm just going to discuss this morning four key facts that I think are very important. I have two central and recurring questions that come up in my mind when I'm thinking about this case, and then I have four angles of analysis that I think are helpful to approach this case. The facts are generally undisputed and certainly contained in the briefs, so just the four key events that I think I'm going to highlight. First is Mr. Zagaria's lot has been continuously since 1946. In fact, he was issued a state identification card by the Secretary of State of Illinois in March of 2009. That's our first key event. In July of 2009, the attorneys in this case petitioned the probate court for a presumption of death. They alleged that they had performed a reasonable inquiry and were unable to locate Mr. Zagaria. The court entered a presumption of death, created the presumed dead estate, and transferred about a half a million dollars of Mr. Zagaria's money into the presumed dead estate. Third, in December of 2009, the attorneys discovered that Mr. Zagaria might be alive. And fourth, in September of 2010, the probate court entered an order saying Mr. Zagaria is indeed alive. They returned the money to him. And the two points on that one that I just want to stress are, Mr. Zagaria had to petition the court himself that he was alive. The attorneys never informed the probate court at any time that he was alive. And second of all- What was the span of time? Nine months. They got information that he was alive in October of 2009. Let's narrow the window of time. Sure. Because wasn't there a period of at least a few months where they had a hint that he might be alive by virtue of the Social Security number showing up on the food stamp registry? But then the homeless shelters wouldn't cooperate with them until they got slapped with a subpoena. The subpoena was issued in December, I believe, December 28th of 2009. And, yes, you are correct. Mr. Zagaria himself was suspicious. Who are these people? Why are they contacting me? And the homeless shelter, correct, they did not necessarily say, hey, here he is, here you go. So that is correct. But they certainly had indications, facts indicating that he might be alive. What was the time frame? The first event would be he actually physically picks up a phone and calls the lawyers or shows up in front of the lawyers. The first day of time event. And then it gets into court and the judge has to reverse it. The first time they met face-to-face, I believe, was June of 2009. Okay. There was correspondence with the homeless shelters throughout- June of 2009 or June- Ten, I'm sorry, 2010. There was correspondence between the attorneys and this homeless shelter saying Mr. Zagaria doesn't know who you are, has no interest in speaking to his sister, who was the administrator of the presumed dead estate. She had no interest in speaking to her and didn't comprehend that he had money sitting in the bank. He didn't comprehend? That's correct. Okay. It wasn't clear to him. The homeless shelter wasn't clear to him. It wasn't clear when I was brought in. When did that take place, Mr. Broderick? When did what? The conversation. At some point after the homeless shelter was contacted and they refused to cooperate because there was no disclosure as to how much money was at stake. Following that, they got a subpoena. Then conversations, some conversations took place where contact information was transmitted to the homeless shelter and they were requested to give that to Mr. Zagaria. A counselor called back and indicated that she had done that. When did that take place? The subpoena was issued, again, in December of 2009. In March of 2010, I believe there was correspondence back and forth, written correspondence between the homeless shelter. So by March of 2010, everybody knew that Mr. Zagaria was alive, whether he wanted to speak to his sister or not. Is that correct? It's not entirely clear when the attorneys knew for a fact that he was alive in the record. I think what you're suggesting is probably correct. I think in that time period between December and March, there was an increasing realization that this is the guy. This isn't just any random homeless shelter. This is a homeless shelter in Arlington Heights where Mr. Zagaria had lived his whole life. So that's another strong indication that this could be our guy, so to speak. The record is a little deficient in one way because in order for us to get our hands around this whole picture, tell us what was going on with Mr. Zagaria. Was it a substance abuse issue? Was it something different that somehow he had a half million dollars in a Merrill Lynch account, never contacted Merrill Lynch, which led everybody in the family to eventually think, well, he's passed away somehow or met some kind of tragic end, and we don't know what the answer is. You're correct. The record is unclear. He was homeless. He was not aware of the fact that he had a half million dollars in a Merrill Lynch account. Is he mentally ill or something? I mean, most people know if they have a half a million dollars. I think that we can all agree on that. How could you have a half a million dollars sitting, somehow the money got to the Merrill Lynch account? I mean, how did that happen without him knowing? He was a successful businessman in the 1980s. I believe, again, it's not in the record, but something happened. I don't know. I've never asked him. It gives us a better understanding of the totality because you have to agree, this is a very unusual case. Which is, as a matter of fact, why you're here before us because this is an unusual setting to set this case at a time when we're not normally setting cases. But I would like to figure out the underlying, not that it's a part of the consideration, but it kind of screams for some understanding. How could you have a half a million dollars sitting out there without some knowledge of it? And doesn't that lend itself to a reasonable belief by the family that this person is deceased? Because most people who have money of that magnitude sitting someplace would do something with it and would not be applying for food stamps. So even after it became known that Mr. Zagarria might be alive, it begs the question of why would somebody who has $500,000 sitting in an account apply for food stamps and public aid? So I'm just asking because it helps to give me a fuller understanding of what is going on in this case. I understand your concern. There's nothing in the record. I have spoken to him on a number of occasions. He's a very private person. I didn't ask what happened. How do you forget about a half a million dollars? I think that's a very legitimate question. He has stated he's not good with money. There is a statement of that effect in the record. I'm not good with money. Obviously there are some issues there. I don't think he would be incompetent under the law. There's been no finding of that in regards. I think if somebody were to try to assert that, I think he has enough faculties to know that he's not good with money. That is an indication to me that he knows. Let's take this and go to the next step because that's exactly where I was headed. You assert that he would probably not have qualified to have a guardian appointed for him if we had gone down that route. I would agree. Let's say for the sake of us trying to structure an answer here, that someone who has half a million dollars and goes around applying for food stamps with no criminal intent and disappears and things like that. Let's say we were in an alternate universe and there was a guardianship appointed for him. The guardian took control of the assets that were administration costs and then he recovered. Does he get back the full amount that the guardian took in the first place or does he get back the full amount less the cost of administration? I believe he would get back less the cost of administration. Why is this different? Because he would be owed a fiduciary duty of care in that case to look after him and his assets, which is absent in this case. But the only issue before us, though, Mr. Braderick, is the attorney's fees from the Nissen-Elliott firm, which Judge Coleman found reasonable. We don't have before us what the record is replete with, which is the references to the sister running office spending money in casinos or whatever. That's not in front of us today. Correct. So all I've got is approximately $10,000 to $20,000 in fees for them opening an estate or doing 10 years of tax returns and chasing around homeless shelters that weren't cooperating with them. So why did Judge Coleman abuse her discretion in assessing those fees? And is that our standard? I believe that the abuse came in by contradicting her prior order, that there's no fiduciary duty. First of all, do you agree that abuse of discretion is the standard of review? Do you agree? Yes. Okay. You don't think that there was interpretation of statutes involved in the case? To a degree there was, but the statutes are silent. Actually, I'm sorry. I'm sorry. I stated in my brief that the standard of review is de novo because it is an interpretation of statutes. And, yeah, I apologize. Okay. So our review is de novo. Yes. Yes. I'm sorry. But do you think our review is de novo? Yes. Do you agree that on the sole issue of whether the fees were, in fact, reasonable for the work performed? Well, that's not the issue. As opposed to whether they get any fees at all. No. That's not the issue. Whether or not the fees are reasonable and fair, I would concede they are fair and reasonable. They were administrations of the estate. I don't assert that the attorneys did anything untoward. They got taken advantage of by their client. They didn't know that. But let's take this one step further. Let's say we all agree that at the very least they did ten years of tax returns for this gentleman who had not had tax returns done. So they performed a service for his benefit. And now he's asking for that service to be free. Is he not and why not? What if they did a bad job on the tax returns? I'm not alleging that they are, but hypothetically they could have watched his tax returns and put him in a bigger tax pickle than he was already in. He has no recourse. He's not owed a duty by them to perform in any fashion any standard of care whatsoever on those taxes. But yet he's being asked to pay for it. You're saying that if they filed a false tax return or ignored something and cost him a penalty, that he'd have no recourse against them in some kind of civil proceeding? I don't know. They certainly wouldn't owe him a standard of care. They're not representing him as an attorney, so it's not an attorney malpractice issue. Well, they're representing his estate, though, which then becomes his money when he shows up alive. And that's kind of the key question for me, is what is the relationship between him and a presumed debt estate when he's discovered a lie? I think that's, in my opinion, that's the heart of this case. And I think had the circuit court previously ruled that he was owed a fiduciary duty, in my opinion, the correct answer, if I was king, would be, yeah, he has to pay the attorney's fees for the administration of the estate up until the point he's discovered alive. Because when he's discovered alive, that estate, I don't know what its status is at that point. I have ideas and suggestions, but it's not clear what happens at that point. When a presumed decedent is discovered alive, what is the role of that estate? And what is the role of the administrator and the attorneys to that administrator? In this case, what's happened is the presumed decedent is treated unlike anybody else under the Probate Act and is not owed a fiduciary duty, but has to pay the fees. But then how does this special bond kick in? Because in a presumed decedent's estate, the statute has a specific provision that requires the recipients of the bounty to basically stand by for a heck of a long time, ready to pay back the money in case the person is found alive even after the estate's closed. Right. And actually, that's certainly one of the unique facts of this case, is when he was discovered alive. If you can indulge me just for a second. Sure. If he had been discovered, you know, this food stamp issue was discovered in June of 2009 prior to the estate, he's still owed, Mr. Zagaris owed no fiduciary duty, certainly by the attorneys at this point. He has no, there's no duty on anybody's behalf. They don't have to tap him on the shoulder and say, hey, you've got a half a million dollars in the bank. They don't have a duty to do that. It would be the right thing to do, obviously. But they don't have a duty to do that. But they would also have a duty to inform the court, hey, we discovered this fact. We don't know if it's him, but somebody's using a Social Security account and getting stamps. Okay. Well, who did the attorneys owe the fiduciary duty, in your mind, up until the point he was found alive? Well, they owe it to the estate, first of all, under the Probate Act. And then they owed it, obviously, to the administrators and any beneficiaries and heirs under Mr. Zagaris. In this case, there's only one. It's his sister who is the administrator. But there is still a concurrent duty and primary duty to the estate itself. Okay. And so maybe, you say that it's estate money up until the time he's found alive? This case gets a little confusing because you present arguments that they weren't estate funds, and I don't know if you mean they were never estate funds from the big creation of the estate, or were they never estate funds after he was found alive? Were they estate funds up to the time he was found alive? Those are great questions. What is your position? Sure. Prior to the creation of the presumed debt estates, the funds were, without a doubt, his and his alone. There's no other claim to it. He owed the money free and clear. The presumed debt estate, for all intents and purposes, was created validly. I'm not disputing that action. So you have a presumed debt estate who has a valid claim to the funds. My position is, when he's discovered alive, the presumption of his death is not fact. It's destroyed. It's destroyed. It's a very weak presumption. The law presumes you're alive until you can prove otherwise. And a presumption is just, we don't know any better. Without the absence of information, we're going to think he's dead. But if you get any facts that tend to prove that he's alive, that presumption crumbles. And my take on that is, at that point, I don't know what happens to the presumed debt estate. You have somebody who's holding money that they're not supposed to. It's not their money because he's not dead. The only reason why the presumed debt estate has the money is because he's dead or presumed to be dead, and if the presumption's gone because you think he might be alive or there's facts indicating that he's alive, the foundation of the presumed debt estate is gone. I think, and just to continue my thought, I think at that point, if you're holding money that's not rightfully yours, that's a constructive trust. And the representatives, in this case the attorneys and the administrator, have a fiduciary duty to the beneficiary of that constructive trust. And their sole job is to return the money to them. And that happened, right? The money was returned. Less $120,000 or so. Which is not before us. Correct. So we all agree that the attorneys did some work. And the work that they did was reasonable under the circumstances and the facts as they knew it at that time. So they have a right to be paid. So what's the remedy for that? They have a client. Their client received over $100,000 from the estate. They certainly have other avenues to collect this money. They're electing not to do that. They're following the estate money from the man that they weren't able to locate. Adam declared dead. Let his sister spend the money. So you're suggesting that they should get their money from the sister, which would mean theoretically from her bond. Okay, because she did post a bond. Did they make a claim on the bond? Is that what you're saying? She posted a bond as an administrator. One bond that was not posted was a distributee bond. There was only one bond in this case, and that's pending. Can you be a distributee of your own estate if you're presumed dead? I don't think so. So, I mean, so there was no distributee bond, but under the facts of this case you wouldn't need one, would you? She would need a distributee bond. For herself. For herself, yes. There would not be one to him. I don't think you're a distributee of your own estate. How can you be? I think that's a circular counterintuitive argument. How can you only be a distributee as a result of somebody's death? Let's cut to the chase here. Who do you think? I mean, these attorneys did some work. I mean, I think everybody can agree that they did work, and they did work reasonably under the circumstances and facts as they knew them to be from their client at the time. Who should pay them? I think their client should. The client is the administrator. The administrator of the estate. Yes. Would this case be any different if we did not have the issue of the sister absconding with some of the money at the casinos and et cetera? Would it be any different? There's lots of ways this case could be different. That certainly is one way, is if she bought ponies is what she did. She bought ponies for her grandkids, and if she hadn't have done that or to the extent of $100,000. Not to say she was the perfect, flawless administrator. If she was a flawless administrator and in December, say January, February, a reasonable time period after which the attorneys discovered that he was alive, he got most of his money back, we wouldn't be here today. He recognizes that there was some value done. He thinks up until the time he was discovered alive, those expenses were fair and reasonable. Would it be fair to say that there was a span of time during which there was a hint that he was alive but not confirmation? Absolutely. And part of that, part of the reason for the lack of a firm confirmation was his own unwillingness to address the situation through the inquiries from the homeless shelter? I would say it was a reasonable suspicion on his part. Nobody trusts us lawyers, right? And if you're already not 100% there mentally, and lawyers are saying they want to talk to you about some money, his natural inclination was they want to take some money. It wasn't clear to him for some time that they already had taken the money and that they wanted to give it back. You had mentioned if he was discovered two years after the estate had been closed, if he had been discovered alive, the estate would have reimbursed the administrator for the payment of the attorney's fees. The attorney's fees would have been paid by the administrator, because that's the client, and that would have been recoverable under the bond. In this case, he's being asked to pay for it essentially out of his personal funds, and that's not going to be covered under the bond. And how long does the special bond last in the statute? Do you remember? Ten years, I believe. Is this estate still open? Yes. Why? There are supplemental proceedings to recover the money from the sister and the bond. Okay. Could you wrap up, Mr. Broderick? Well, I got about two paragraphs into what I wanted to talk about. Well, you know, that's what happens in RLRC. No, that's fine. The other thing I want to say, though, is this is not a creditor's claim against the estate, because there is nothing in the record, there's no support in the law or the statutes, that there's a priority analysis. And why do the attorneys get priority claim to the estate funds before the presumed decedent? And that's assuming that the estate itself has a superior claim to the funds than the presumed decedent itself. So if you're going to treat this as an estate citation case, which is the procedural background of why we're here, you've got to have a prima facie showing, which isn't in the record, that the estate itself has a superior claim to the funds. And then you can go to a priority classification scheme, and there's nothing to support that. Is this an alternate argument? Because you just said that the money is being taken from his personal funds. Now you're talking about priority. The chain of custody of the funds that we're talking about certainly was he owned it and went to the presumed debt estate. He owns it again now. So whether or not they're estate funds or non-probate funds, that's an undecided question as well. I don't know the answer to that. Okay, but now you're making an argument as to priority. Yeah, if these are determined to be. If they are. Yeah, if they're determined to be. Then it's an alternative argument. Correct. I actually have a couple of questions. Can you respond to your opponent's point about, you know, the lack of jurisdiction as to your – There's only one issue, according to your opponent. But you've raised several, and they're saying those issues are not properly before us because he didn't raise them below and in the proper way. So can you respond to that? Sure. The March 8th order finding that he was not owed a fiduciary duty did not dispose of all the claims between the parties. They still had an outstanding claim against him for attorney's fees. So that was not a final appealable order. But you're arguing it. So if it's not final and appealable, then it shouldn't be before us. And if it's before us, it ought to be final and appealable. And you can't have it both ways. So either you're arguing it or you're not. You did argue it. So I don't understand your argument, what you're saying now. That's my argument. And the April 11th, 2012 order was against the estate, not him personally. That was an in-rem order against the state, finding that the fees and costs of the attorneys were fair and reasonable. He was not adversely affected by that specific order. Thank you. You'll get a few minutes for rebuttal. Thank you. May it please the Court. My name is Michael Daly. I represent the law firm of Beeson and Elliott and Mr. John Lesh, Mr. Thomas McCauley. They're my partners. Whenever you go over the facts of this case with anyone for the first time and you explain to them what happened or what we think happened in this case, the first question out of their mouth is the one that was raised by this Court. Is there something mentally wrong with this person? We may never know why a 54-year-old man abandoned his home, turned his back on the only family that he ever knew, and chose to live a life on the street. We'll never know. What we do know is this, that if it wasn't for the actions of one of my partners, this man would not have seen a dime of the money that he now enjoys, and that is a fact.  I have another question I didn't ask. It's not clear to me from briefs and the record that Mr. Zagarria didn't know he had this money. Did he not know, or did he know and just abandon it the way he abandoned everything else that was in his prior life? Did he know or not? You're absolutely right, Judge. It's not in the record. And I have no idea. Because the point was made that but for the actions of the lawyers, he would not be enjoying this money. But I couldn't tell whether he knew he had the money and just abandoned it along with everything else. And once all of this started, he has now come back to enjoy money that he knew he had but didn't care about but maybe started caring about it later. A couple of things would militate against that argument. The first, of course, is that he was applying for food stamps. And absent a malicious intent on his part, it would suggest that he was completely unaware that he had these assets. Because if he did, he's got bigger fish to fry than $27,000 in attorney's fees. The second aspect of this is that with respect to the account itself at Merrill Lynch, our client, and this is a matter of record, received notice that the funds were about to escheat to the state, which, of course, is possible after five years, but the notice came out after almost ten years of complete inattention to it. In addition to that, Your Honor, there's a third aspect of it, and this is also of record, that in 1993, Mr. Zegaria was appointed to be an administrator of his parents' estate. And because he did nothing on his parents' estate, our client moved to have him removed as the administrator of his parents' estate. That was, I believe, in 1999. All of that is of record. So the confluence of all those factors seems to suggest, anyway, that he either didn't care or was unaware of it. It wasn't that he had some sort of master trading strategy, I think. With respect to the jurisdictional issue, Your Honor, it's important to remember that there are three orders that have been combined, conflated into this appeal somehow, and I think that that's wrong. The first order was the order that was entered in March of 2012. That was the order dealing with a petition for surcharge that was filed by Mr. Zegaria, alleging somehow that my law firm was complicit in the malfeasance of the administrator somehow in handling the estate. That's obviously a completely different issue than the one that we're here for today. Let me ask you another question. It's pretty much in keeping with what your opponent said. Basically, your client was the sister. What's her name? Joanne Corlett. Ms. Corlett. Why not get the money, get the fees from her? I mean, she's the one that hired you, and you were responsible to her, and she was the administrator of the estate, and Zegaria is a beneficiary, if you want to call it that. But why not get the money from your client? The reason, Your Honor, has to do in part with our fiduciary duties that are here. Your fiduciary duty is to who? The estate. And not to the administrator? In part to the administrator, but primarily to the estate. That is our duty in this case. Well, if you have a partial fiduciary duty to the administrator and complete fiduciary duty to the estate and no fiduciary duty to Zegaria, is that why you think the fees ought to come from him as opposed to from the administrator who is your client? Well, no. That and the fact that the probate code says that attorneys who provide services to an estate are entitled to compensation from the estate. That happens every day, and that's what we're supposed to be doing. We're supposed to be getting our pay for our services from the estate and not from administrators individually. If you have a fiduciary duty to the estate, don't you have a fiduciary duty to beneficiaries of the estate? And who would be more a beneficiary of this estate, if you will? And maybe that beneficiary term does not fit perfectly. Then Mr. Zegaria. I think if we're trying to put the issues that are raised by the facts into the cubbyholes of the law, that what we have here is an estate, and we have a duty to the people that we know about. If we are going to suggest that we owe fiduciary duties to a person who isn't just presumed dead, the judge parabolized his order in July of 2009, declared that he had died as of 2007. I believe it was August 10th of 2007. That's what we're working off of. And so to suggest that we have a fiduciary duty to a person that a court has already declared dead is going to be a sea change in fiduciary duty law, if we decide that that's going to happen. Now, once Mr. Zegaria appears, which did not occur until June of 2010, and I would submit to the court that it was extraordinarily reasonable for my clients not to believe that Zegaria was in fact alive until they met with him because of the circumstances, because of the situation. Until at that point in time, then I think there is an obligation that changes, and we then pursued that obligation and did what we could to restore the assets. And at that point, after what your opponent calls an undue delay, you get back in front of Judge Coleman, and she returns the assets or retitles the assets immediately before your law firm could basically get your hands on some of it. And that creates another complication in the case, doesn't it? It sure does. Because we've got this whole issue about the turnover order and the charging order. Right. And why didn't somebody raise their hand and say, hey, before you turn it back, here's our bill, and we'll walk away? Because an accounting was also ordered too. Right. But the funds weren't there. It should have been done, candidly. It should have been done at that time, and it wasn't. But under the circumstances, and if you knew my partner who was responsible for this, there is a guy comes out of the war work and says, I'm alive after we had been working for all this time. His immediate instincts are, you know, go. Yeah. Take it. We should have done it the way that Justice Bellord suggested, and we didn't. But I don't think that can be held against us now at this point. I'm sorry. Go ahead. We're operating here with a dearth of case law. All right. And we're trying to make the parallels to the traditional estate, the guardianship estate protocols. What guidance does the statute give us, if any, with what's supposed to happen when somebody shows up alive? And I think this is a follow-up to Justice Rochford's question, and that is that I think in this situation, we have to regard Mr. Zagaria as a distributee of the estate. The estate is, in fact, still open. The estate was created pursuant to a valid court order.  And so what had happened was that my partner had marshaled the assets of the estate, put it together, and prematurely distributed the assets of the estate before all the claims could have been paid. The case law. Which if there was a true decedent's estate. Right. If it was a true decedent's estate. Somebody's got to give a piece of paper to the judge, don't they, that says all claims have been paid? All claims have been paid. And then we have that period afterwards where all bets are still on. That under section, I believe it's 12D of the code, that says that those claims can be clawed back, if you will, from distributees of the estate. Yeah, and that 12D doesn't seem to fit this scenario. Well. When the funds are someplace else. They're given back to Mr. Zagaria. And that's why I believe that. You don't represent the sister any longer. And she's not the administrator any longer. There's still an estate. There is still an estate. And if you're trying to pigeonhole this admittedly unusual fact situation in a traditional probate distribution, I think that's how you have to regard it. That he is a distributee of the assets. Under the code, we are permitted that an estate is permitted to issue citations to discover assets. An estate. I'm sorry? An estate. An estate, that's correct. It says that the, what is it, the representative or some other entrusted party. But isn't that supposed to be bringing back or finding assets that belong to the estate that may not have been in there in the first place? It's very hard for me to put this particular fact pattern in the statute. Well, I think it's easy to overanalyze this. And I don't mean to be simplistic. No, simplistic is sometimes the best way to do it. I want to suggest to the court that the difference is no different than, or this case is no different than a judgment creditor of any estate who files a claim, a valid claim that exists past the bar date. Or a situation where, in the previous section, before the presumed debt estate, a situation where the administrator of the estate makes a determination to make a premature distribution before the bar date for claims. And in that case, the administrator has to put up exactly the same type of surety bond that a presumed debt estate administrator has to post. And in that situation, if someone files a claim that exceeds the amount of the distributions, those distributions have to be returned. And I think that's exactly the situation here. I have another question, and this is about the severe. Your opponent makes a great deal of the argument that if a presumed decedent owes attorney's fees for the creation of his own estate, then shouldn't the presumed decedent be owed a fiduciary duty of care when he's discovered alive? In other words, he can't be held to be responsible for attorney's fees and yet owe absolutely no duty of care by the attorneys. That seems inconsistent with established case law, the probate act, good common sense, all of those things. Sure. Can you respond to that? It's easy to think that if you allied the distinction, if you combine the distinction between Mr. Zegaria and his estate. They're two different things. The fiduciary duty, and the fiduciary duty law is a simple one that we're all familiar with. That there's trust and confidence that are reposed in someone. That as a result of that trust and confidence, there's superiority and influence. And finally, the confidence must be accepted by the party. And so what that means in this case is that Mr. Zegaria, presumed to be dead, a complete stranger to his case, his estate, had somehow reposed trust and confidence that we had superiority and influence over him. I can't see how that would occur. And then finally, that the confidence that Mr. Zegaria placed in us was accepted by us. That's what the fiduciary obligation requires. If you find that in this case, you throw the fiduciary duty law on its head. Because none of those facts exist here. There is no fiduciary duty owed to a dead person. Now, the whole question of whether or not a fiduciary duty even existed, or whether or not a fiduciary duty was discharged in this case, is an issue of fact that was determined by Judge Coleman. And as far as the standard of review that was suggested before, clearly, without doubt, the March 2012 order is an abuse of discretion standard. Without doubt, in our opinion, the April order, which determined the reasonableness of Meese and Elliott's fees, that's an abuse of discretion standard. And finally, the order that was entered in August, in which the turnover was entered, arguably could be called a de novo standard, because I think that is pretty much a question of law. But you can see from these orders that they're very distinct, very different, and they terminate the rights of different people at different stages of this proceeding. As a result, those two orders, the March and April orders, are final orders. And more importantly, when you're trying to make a decision as an appellate court, to look at the record here and find out whether or not the court below had done the right thing, you don't have a transcript. You don't have a written record of the proceedings. You don't know what Judge Coleman resolved and what she did not resolve at each stage of the proceedings. Each one of these orders are the same. For the reasons stated in open court, we either grant or deny the motion. That's it. So it's a difficult task for you. And more than that, I'm sorry, Your Honor. Were there transcripts? No. But more than that, Your Honor, the law is very clear that in the absence of those transcripts, and when the burden is on the appellate to provide an adequate record for the court, in the absence of those transcripts, this court must presume that Judge Coleman had a reasonable, factual, and legal basis for making her decision. And I would submit that if the transcripts were here, I'd make the same argument. But here, the burden is even greater. How about the fact that in certain circumstances and in a state situation, you may have a fiduciary duty to unknown heirs? Right. How is that not similar? The Howells case, I think, is sort of a one that kind of sticks out there, or at least a fiduciary duty to beneficiaries. It's a muddled area, but it's a little bit unclear as to exactly whether or not an attorney to an administrator owes a fiduciary duty to beneficiaries. But in this particular case, we certainly didn't know who the beneficiary was. We certainly didn't know who the potential distributee was. What we knew was is that someone had been declared dead by a court of law, and we operated under that assumption. And once we found out facts that indicated otherwise, we acted appropriately, and there's no indication in the record that we did otherwise. Anything else? Only to say, Your Honor, that the firm that my work did in this case was necessary. It was reasonable. The fees, of course, are reasonable, and the court below has found so. This is, at heart, a pretty simple creditor's case, and that's the order that's under review. That's the order that was subject to the notice of appeal, and that's why we believe that we should be paid. Thanks so much. And the order that you were seeking in the trial court was to recover trust assets, correct, in that first element? Or how did you? Assets of the estate. Assets of the estate. I'm sorry, not assets.  The order was entered against the estate. We issued a motion for turnover of assets to the estate and a citation to discover assets, and that's what we were seeking. Recovery of estate assets. Okay. Thank you, counsel. Thank you. Mr. Brodbeck, brief rebuttal, please. I will be brief. The emphasis on brief. I will be brief. I just have three points that I'll bring up. Why Mr. Zagarria forgot about his funds is interesting. It provides color. It gives us background as people. But, quite frankly, it's none of our business. It has nothing to do. He can do whatever he wants with his money. It was undisputed that it was his money. There's nothing in the record to say that guardianship would be appropriate that would have been issued. There's steps that people could have taken if they were concerned about that. In the absence of that, it's none of our business as to what he chose to do with his money or not choose to do with his money. Second of all, we can't pick and choose which parts of the probate act we can apply to the presumed debt estate. The Denton case in 2012 in the second district said you can't use the priority scheme for decedents and the classification scheme for a decedent estate in a guardianship estate. If you can't do that for a guardianship estate, why can we do that for a presumed debt estate? And absolutely to your question, there is without a doubt an attorney's to an estate can have a fiduciary duty to unknown parties. In this case, if the estate in question was, say, Mr. Zegaria and his sister's parents' estate, you would open a presumed debt estate for Mr. Zegaria if he was absent. So you could distribute the estate of the parents properly. And if the attorneys to the estate of the parents would absolutely owe a fiduciary duty to the presumed debt estate and its beneficiaries, whether they're known or unknown, you owe a duty to an unknown heir as an attorney to an estate. So that is without question. You can owe it to somebody that's known or unknown. And on that, it's not a fact that he was dead. Whether the court said so, the court said there is a presumption of his death, and that was the fact in this case. Obviously, it wasn't a fact that he's dead because he's alive and well in Arlington Heights right now. Thank you. Thank you. Okay. This case will be taken under advisement. Thank you both for a good argument, spirited argument, and an interesting back pattern. This court's adjourned. Thank you.